SUPERIOR COURT 
 
 JOHN W. BALDWIN, JR., ROBERT N. BALDWIN, JAMES R. BALDWIN, AND JOHN E. BALDWIN v. THOMAS P. CONNOR, JR., MARIA H. CONNOR, JOHN J. CONNOR, II, NICHOLAS KOURTIS, POLYVINYL FILMS, INC., AND INDUSOL, INC.

 
 Docket:
 1984CV03396-BLS2
 
 
 Dates:
 March 29, 2024
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND A MOTION TO FURTHER AMEND THE COMPLAINT
 
 

 John W. Baldwin, Jr. (known as “Jack”), Robert N. Baldwin, James R. Baldwin (“Jim”), and John E. Baldwin (the “Baldwins”) claim they were unlawfully frozen out of closely-held corporations by Thomas P. Connor, Jr. (“Tom”), Maria H. Connor, and John J. Connor, II (“Jack”) (the “Connors”), who together held or hold majority stakes in both companies. The Baldwins contend that they successfully ran and grew Polyvinyl Films, Inc. and Indusol, Inc., (“the Companies”) and that the Connors, with assistance from Nicholas Kourtis, forced the Baldwins out of their operational and management roles as part of a plan to sell the Companies and increase the profit to the Connors. The Connors contend that the Baldwins had mismanaged the Companies.
The Court rules as follows on the five pending motions for summary judgment and a separate motion by the Baldwins to amend their complaint.
With respect to the Baldwins’ claim for declaratory judgment against the Companies regarding statutory rights of appraisal, and the cross-motions for summary judgment as to that claim, the summary judgment record establishes that (1) the Companies’ articles of organization and bylaws were not amended in 1983, votes by the boards of directors and shareholders in 1986 and possibly in 2000 did not result in effective amendments of the articles or bylaws or in any enforceable shareholders’ agreement, and the May 2019 votes to amend the Companies’ articles of organization and bylaws were valid (as the Companies contend), but that (2) the restated articles of organization adopted in 2019 imposed new restrictions on share transfers and therefore triggered the Baldwins’ statutory right to sell their shares back to the Companies at fair value (as the Baldwins contend). The Court will order that the Baldwins are entitled to declaratory and equitable relief so that they may belatedly exercise their statutory rights of appraisal if they choose to do so.
 
                                                            -1-
 
With respect to the Baldwins’ claims against the Connors and Kourtis, the Court will: (I) allow in part the Connors’ motion for summary judgment with respect to all claims against Jack Connor, the breach of contract claim against Maria and Tom Connor, and many parts of the breach of fiduciary duty claims against Maria and Tom; (ii) deny in part the Connors’ motion with respect to the claims for breach of fiduciary duty based on Maria’s and Tom’s failure to notify the Baldwins of their statutory right of appraisal in connection with the May 2019 adoption of restated articles of organization, and based on their alleged freeze-out of the Baldwins from their management and employment positions, and with respect to the claim against Maria and Tom for civil conspiracy; and (iii) deny Kourtis’ motion for summary judgment as to the civil conspiracy and aiding and abetting claims against him.
The Court will deny the Baldwins’ motion to further amend their complaint because the proposed claims against Attorney Stephen Kane would be futile.
Finally, the Court will allow the Baldwins’ motion for summary judgment as to Maria and Tom Connor’s remaining counterclaims against them.
The Court’s decision on these motions resolves many of the key issues that divide the parties. This may be an appropriate time for the parties to retain and work with a neutral mediator to explore the possibility of settling their disputes. The Court will order the parties to report within four weeks whether they are willing to do so.
1. Declaratory Judgment as to Alleged Amendments and Appraisal Rights. The Baldwins have asserted a claim for declaratory judgment (count V of their complaint) regarding the effect of certain potential or actual amendments to the Companies’ articles of organization and bylaws. The Baldwins contend that votes by the Connors in 2019 to revise restrictions on the sale or transfer of shares in Indusol or Polyvinyl were invalid or, alternatively, imposed new restrictions on the transfer of shares and thereby triggered the Baldwins’ statutory right to an appraisal and to sell their shares to the corporations for their fair value. The Companies contend the opposite, that the 2019 amendments were valid and did not trigger appraisal rights.
The Baldwins and the Companies have filed cross-motions for summary judgment as to these issues.
The summary judgment record establishes that (I) potential amendments to the articles and bylaws in 1983, 1986, and 2000 did not take effect and were not
 
                                                            -2-
 
enforceable as shareholder agreements, (I) the 2019 amendments were valid, and (iii) the 2019 amendments triggered appraisal rights because they imposed new transfer restrictions not present in the corporations’ original articles of organization or bylaws. The Court will address these issues in the chronological order of the underlying documents or events.
Some of the relevant events were governed by G.L. c. 156B, the original Massachusetts Business Corporation law; that statute was adopted in 1966, took effect October 1, 1965, and applied to then-existing domestic corporations. See St. 1964, c. 723, § 1 (adopting G.L. c. 156B); American Discount Corp. v. Kaitz, 348 Mass. 706, 710 (1965) ©. 156B was effective October 1, 1965); G.L. c. 156B, § 3(a) (applicability). Events that took place after June 30, 2004, are governed instead by G.L. c. 156D, the revised Massachusetts Business Corporations Act; that statute was adopted in 2003, took effect on July 1, 2004, and applies to then- existing domestic Massachusetts corporations. See St. 2003, c. 127, §§ 17 & 22.
1.1. The Original Transfer Restrictions. Indusol was formed under another name in 1950; Polyvinyl Films was formed under a different name in 1954.
The original articles of organization and bylaws of Indusol and Polyvinyl Films gave both companies a right of first refusal before a shareholder or their estate could sell their shares in either corporation to anyone else.[1]
The articles and bylaws provided that a stockholder (or their heirs, assigns, executors, or administrators of their estate) that wanted to sell or transfer their shares had to first offer the stock to the corporation, by notifying the board of directors of their wish to sell and the price at which they would do so.
After receiving the notice, the Board would have 30 days either to accept the shareholder’s offer or choose to have arbitrators determine the value of the stock; if the Board did neither of those things within 30 days, that would waive the corporation’s right to buy the shares. If the Board decided to purchase the shares, then the Board would have to consummate the purchase within 30 days after accepting the offer or after the arbitrator’s report; failure to do so would waive the corporation’s repurchase right.
 
--------------------------------------------
 
[1] The provisions in the articles of organization applied to the sale or transfer of  all shares of stock. The provisions in the bylaws applied only to the sale or transfer of stock with voting rights. The Court understands that this difference is immaterial in this case because all stock at issue here had voting rights.
 
                                                            -3-
 
The original articles and bylaws provided that, if the corporation did not timely exercise its right to purchase shares offered for sale, then the shareholder would be “at liberty to dispose of the same in any manner he may see fit.”
Finally, the original articles and bylaws provided that the Board of each corporation could at any time waive the requirement that no shares may be sold or transferred without giving the corporation this right of first refusal. There was no requirement that every Board member unanimously agree to waive the corporation’s rights.
1.2. No Amendments Were Adopted in 1983. The Baldwins contend that unsigned minutes for special shareholder meetings establish that the Indusol and Polyvinyl shareholders voted on March 14, 1983, to adopt an exception to the original transfer restrictions. The Court disagrees. The summary judgment record makes clear that no such vote ever took place.
If these unsigned minutes in fact reflected what happened on that date, they would show that the shareholders for each corporation unanimously voted to amend the articles of organization and bylaws to add a new paragraph at the end of the right-of-first-refusal provisions, stating that the sale or transfer restrictions summarized above shall not apply to any sales, gifts, or other transfers to a shareholder’s “spouse or lineal descendants.”
But there is no evidence that any amended articles or bylaws were ever prepared based on a March 14, 1983, vote to amend.
Furthermore, signed minutes for meetings of the Indusol and Polyvinyl shareholders and boards of directors on June 12, 1986, make clear that no vote to amend the articles and bylaws was actually taken in 1983. The 1986 minutes include “whereas” clauses stating that the corporations’ articles of organization and bylaws include provisions restricting the transfer of shares. The 1986 minutes then quote the existing provisions in their entirety. When doing so, the 1986 minutes do not include or even allude to any 1983 amendment exempting transfers to a shareholder’s spouse or lineal descendants. Instead, they quote the original transfer restrictions without revision, thus making clear that these provisions were not amended in 1983.
These signed minutes indicate that the shareholders and boards voted in 1986 to add a different paragraph to the end of the right-of-first-refusal restriction. The new paragraph provides that:
 
                                                            -4-
 
The foregoing restrictions shall not be applicable to sales, gifts, or other transfers by a Stockholder either intervivos or by Will or by operation of the statute of intestate distribution to the spouse or siblings or lineal descendants of such stockholder.
The 1986 vote was not to delete the paragraph added in 1983 and replace it with a different paragraph. Instead, the shareholders and boards voted in 1986 to add this paragraph to the end of the restriction found in the original articles and bylaws. There would have been no need in 1986 to exempt intervivos transfers to a shareholder’s spouse or lineal descendants if the articles and bylaws had already been amended in 1983 to exempt such transfers.
In sum, no reasonable factfinder could find that the draft vote reflected in the unsigned 1983 minutes was ever taken and approved by the Companies’ directors and shareholders.
1.3. Effect of the 1986 Votes. As for the 1986 votes themselves, they did not have the effect of amending the articles of organization (because no amendment was filed with the Secretary of the Commonwealth), they made no enforceable amendment to the bylaws (because these amendments were inconsistent with the existing articles), and they were also not enforceable as shareholder agreements (because of the same inconsistency).[2]
1.3.1. The 1986 Amendments Did Not Take Effect. On June 12, 1986, the Indusol and Polyvinyl boards of directors and shareholders voted unanimously to revise the share transfer restrictions in the Companies’ articles of organization and bylaws to add the paragraph quoted above. The effect of these amendments, if they had taken effect, would have been to exempt from the right-of-first-refusal restriction any transfer of stock to a shareholder’s spouse, siblings, or lineal descendants, whether the transfer was made while a shareholder was still alive or after their death.
These votes were not effective, standing alone, to amend the articles of organization. The then-governing statute provide that an amendment of a corporation’s articles of organization would become effective only when filed with the Secretary of the Commonwealth. See G.L. c. 156B, § 72. Since it is undisputed that the amendments approved in 1986 were never filed with the Secretary, they never took effect.
 
--------------------------------------------
 
[2]        If the unsigned 1983 minutes were evidence of actual votes, those votes would have no practical effect here for all of the same reasons.
 
                                                            -5-
 
And since the articles of organization were not amended in 1986, it follows that the votes to amend the bylaws were not effective either.
The 1986 amendment made the bylaws inconsistent with transfer restrictions in the Companies’ original articles of organization, which were still in effect.
As a result, the bylaw amendments were a nullity. Where a corporation’s bylaws conflict with the articles of organization, the bylaws are subordinate and “the articles of organization control.” Primate and Bishops’ Synod of Russian Orthodox Church Outside Russia v. Russian Orthodox Church of the Holy Resurrection, Inc., 35 Mass. App. Ct. 194, 200 (1993), aff’d, 418 Mass. 1001 (1994) (affirming judgment “for the reasons stated in the opinion of the Appeals Court”); see also G.L. c. 156B, § 16 (“A corporation may make by-laws which may contain any provisions not inconsistent with law or the articles of organization for the regulation and management of the affairs of the corporation.”).
1.3.2. The 1986 Votes Were Not Enforceable as Shareholder Agreements. The Baldwins argue that the 1986 votes would be “valid and enforceable as shareholder agreements,” even if they never because effective as amendments to the articles of organization or the bylaws. The Court disagrees.
At common law, before the Legislature adopted c. 156B, shareholders could bind themselves by contract to restrictions on share transfers that were inconsistent with a corporation’s articles of organization. Prior to October 1965, if a corporation’s shareholders voted to amend the corporation’s bylaws, and the amendment never took effect because it amounted to an amendment to the articles of organization that had not been filed with the Secretary of the Commonwealth, the agreed-upon terms could nonetheless be binding as a shareholders’ agreement. See Krauss v. Kuechler, 300 Mass. 346, 349 (1938).
In Krauss, a corporation’s bylaws provided that upon a shareholder’s death their stock became property of the corporation, and the shareholders voted to amend the bylaws and entered into a parallel written agreement providing that in those circumstance the corporation must pay whatever price is agreed upon by the surviving shareholders. Id. at 347–348. The Supreme Judicial Court held that the written agreement was enforceable even if the bylaw amendment never took effect. Id. at 349.
The Legislature changed this background rule by adopting c. 156B. As discussed above, § 16 of this statute provided that corporations may only adopt
 
                                                            -6-
 
bylaws that are “not inconsistent” with their articles of organization. A corporation’s articles of organization and its bylaws both constitute a contract between the corporation and its shareholders. See Chokel v. Genzyme Corp., 449 Mass. 272, 275 (2007) (articles of organization); Jessie v. Boynton, 372 Mass. 293, 303 (1977) (bylaws). But G.L. c. 156B, § 16, established that shareholders may not contract around the articles of organization by adopting inconsistent provisions as bylaws. It follows that shareholder may not do the same thing by adopting provisions inconsistent with the articles of organization in something they call a “shareholders’ agreement” rather than an amended “bylaw.”
The Baldwins’ argument that the 1986 votes must have been valid shareholder agreements, because various Connor family members transferred Indusol and Polyvinyl shares to other family members in purported reliance on those votes, is unavailing. Just as a contracting parties’ subjective understanding cannot trump the plain meaning of unambiguous contract terms,[3] so a mistaken belief that a shareholder’s vote creates contractually enforceable rights does not make it so.
It does appear to be undisputed that the Companies’ board members knew of the transfer of shares to Connor family members, did not object, and did not seek to exercise the Companies’ right of first refusal.
But this shows only that the board members implicitly waived that right, not that the 1986 votes did away with the right in a manner that was inconsistent with the plain language of the articles of organization. Waiver of contract terms or rights “may be express or [may be] ‘inferred from a party’s conduct and the surrounding circumstances.’ ” BourgeoisWhite, LLP v. Sterling Lion, LLC, 91 Mass. App. Ct. 114, 119 (2017), quoting Dynamic Mach. Works, Inc. v. Machine & Elec. Consultants, Inc., 444 Mass. 768, 771 (2005).
1.4. The Alleged Votes in 2000. The Baldwins have presented unsigned documents purporting to show that on September 25, 2000, the Indusol and Polyvinyl boards of directors and shareholders voted unanimously “[t]hat any and all restrictions presently imposed upon the transfer of the corporate stock
 
--------------------------------------------
 
[3] See, e.g., Eigerman v. Putnam Investments, Inc., 450 Mass. 281, 288 n.8 (2007); (parties’ alleged “practical understanding” of how their agreement should be implemented cannot trump unambiguous contract language); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 147 n.9 (2007) (parties’ subjective understanding of contract terms cannot create ambiguity); accord Herson v. New Boston Garden Corp., 40 Mass. App. Ct. 779, 791–792 (1996).
 
                                                            -7-
 
may be waived by a unanimous vote of the Stockholders and Board of Directors.”
The Baldwins contend that these votes, if they happened, amended the Companies’ articles of organization and bylaws to require that any waiver of transfer restrictions be approved by every member of the Board of Directors and by every shareholder.
This evidence, standing alone, does not show that these votes were actually taken. The Baldwins do not point to any affidavit, deposition testimony, or other competent evidence that establishes that these shareholder and board votes actually took place. Although the 2000 documents for the two purposed stockholder votes have signature lines for James R. Baldwin, and the Baldwins submitted a sworn affidavit by James Baldwin, he does not contend that he participated in any such votes in 2000 or ever signed the documents now relied upon by the Baldwins.
In any case, even if these votes actually happened, they would not have been effective, for the reasons discussed in § 1.3.1 and § 1.3.2 above. These purported votes, standing alone, could not have amended the articles of organization because no such amendments were filed with the Secretary of the Commonwealth. See G.L. c. 156B, § 72. And they could not have amended the bylaws or been enforceable as shareholder agreements, because they were inconsistent with the articles that remained in effect. See G.L. c. 156B, § 16.
1.5. The 2019 Amendments Are Valid. On May 13, 2019, the boards of directors and a majority of the shareholders of Polyvinyl and Indusol voted to adopt restated articles of organization that exempted transfers of shares to family members from the Companies’ rights of first refusal and imposed a detailed new set of restrictions on share transfers. They also voted to amend the bylaws to remove the previously duplicative transfer restrictions.
The Baldwins contend that these votes by the boards of directors were invalid. If that were correct, then the shareholder votes would have no effect, because by statute the amendments to the articles had to be adopted first by the boards of directors and only thereafter submitted to the shareholders for their approval. See G.L. c. 156D, § 10.03. But the Baldwins’ challenges to these board votes are without merit.
 
                                                            -8-
 
1.5.1. The Polyvinyl Board Had a Quorum. James R. Baldwin could not deprive the Polyvinyl board of the power to act by resigning as a board member and walking out after the board meeting had begun.
At the start of this meeting, at around 9:00 a.m. on May 13, 2019, all three members of the Polyvinyl board (Jim Baldwin, Maria Connor, and Tom Connor) were present. John Baldwin and Robert Baldwin were also present. After the clerk (Maria Connor) determined that notice of the meeting had been properly given and a quorum was present, Jim Baldwin read aloud a three- page letter (it is attached to the meeting minutes) and said he would resign from the board unless the demands in his letter were met. The other board members (Maria and Tom Connor) declined to do so. At that point John Baldwin said he was resigning from the Polyvinyl board, Robert Baldwin said he was resigning from the Indusol board, and the Baldwins left the meeting.
After the Baldwins left the Polyvinyl meeting, the two remaining board members voted to approve restated articles of organization and restated bylaws. At a shareholder meeting later that day, all of the Connors’ shares were voted to approve the restated articles and bylaws.
This vote by the Polyvinyl board was valid. At the start of the board meeting, the board had three members, which satisfied the requirements of G.L. c. 156D, § 8.03(a) (if corporation has more than two shareholders, it must have at least three directors). After James Baldwin resigned from the board and left the meeting, the two remaining board members could take any action that they agreed upon, because they constituted a majority of the board members “in office immediately before the meeting” began. See G.L. c. 156D, § 8.24(a)(2). The purpose of this statutory provision is to ensure that a corporate board can continue to act even if a board member voluntarily resigns or is involuntarily removed during a board meeting. Section 8.24(a)(2) applies with full force to corporate boards that, like the Polyvinyl board, start a meeting with the statutory minimum number of board members required by § 8.03(a).
1.5.2. Maria and Tom Connor’s Votes Counted. The Baldwins’ assertion that Maria and Tom Connor had conflicts of interest that barred them from voting as board members to approve the restated articles and bylaws is without merit.
It is undisputed that, at the time of the votes on May 13, 2019, Maria and Tom had made a proposal to purchase Jack Connor’s shares.
 
                                                            -9-
 
But that did not mean that Maria and Tom had a conflict of interest so that under G.L. c. 156D, § 8.31, their votes as directors did not count, as the Baldwins contend. Section 8.31, by its terms, applies only to a “conflict of interest transaction,” which is defined as “a transaction with the corporation in which a director of the corporation has a material direct or indirect interest.” Id. The tentative plan for Maria and Tom to buyout Jack Connor and his children did not involve any “transaction with the corporation.” And the board votes to approval restate articles and bylaws for Polyvinyl did not involve a “transaction with the corporation” either. Quite simply, the board vote to amend the articles and bylaw did not trigger disqualification under § 8.31.
1.6. The 2019 Amendments Triggered Appraisal Rights. The 2019 amendments to the Companies’ articles of organization added restrictions on the transfer of outstanding shares. As a result, adoption of those amendments triggered the Baldwins’ statutory right to an appraisal and to compel the Companies to purchase their shares for fair value. See G.L. c. 156D, § 13.02(a)(5). The statute is triggered whether the new restrictions are materially adverse to the Baldwins’ ability to transfer their shares or not. But the Court concludes that the new restrictions are materially adverse, so the statute would be triggered even if that were a requirement.
1.6.1. Parsing the Statute. By statute, any amendment to a corporation’s articles of organization or bylaws will trigger a shareholder’s right to appraisal if the amendment “adds restrictions on the transfer or registration of any outstanding shares held by the shareholder or amends any pre-existing restrictions on the transfer or registration of his shares in a manner which is materially adverse to the ability of the shareholder to transfer his shares.” G.L. c. 156D, § 13.02(a)(5).
Under this provision, a right to appraisal is triggered if an amendment to articles or bylaws either (1) “adds restrictions” on a shareholder’s ability to transfer their shares, or (2) “amends any pre-existing restrictions … in a manner which is materially adverse” to the shareholder’s ability to transfer their shares.
This understanding of the statutory language is consistent with the so-called “last antecedent rule.” When reading a statute or other legal document, the general rule is that “a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation.” Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass.  118,  123 (1986),  quoting  Commonwealth  v.  Brown,  391  Mass.  157, 160
 
                                                            -10-
 
(1984). In other words, “a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows.” Lockhart v. United States, 577 U.S. 347, 351 (2016), quoting Barnhart v. Thomas, 540 U.S. 20, 26 (2003). This “last antecedent rule” is a “rule of statutory as well as grammatical construction.” Commonwealth v. Wright, 88 Mass. App. Ct. 82, 87 (2015), quoting Hopkins v. Hopkins, 287 Mass. 542, 547 (1934).
The Companies contend that the statute should be read differently, so that the clause “in a manner which is materially adverse” modifies not only the phrase “amends any pre-existing restrictions” but also the phrase “adds restrictions.”
This is not a natural or reasonable way to parse the statute. It makes no sense to speak of “add[ing] restrictions … in a manner which is materially adverse” to a shareholder’s right to transfer shares. A board of directors might add restrictions that are materially adverse to transfer rights. But it is the substance of the restrictions that might make them materially adverse to a shareholder’s rights, not the manner in which the restrictions are added. In contrast, where there are existing transfer restrictions, and the board amends them, it is perfectly naturally to say that the restrictions may be “amend[ed] … in a manner which is materially adverse” to a shareholder’s transfer rights, as the phrase “materially adverse” is qualifying the substance of the amendment, not the manner in which it was adopted.
The Companies’ reliance on Bednark v. Catania Hospitality Group, Inc., 78 Mass. App. Ct. 806 (2011) is misplaced. Bednark was construing a statutory provision that permits employers to impose a “house or administrative fee in addition to or instead of a service charge or tip, if the employer provides a designation or written description of that house or administrative fee, which informs the patron that the fee does not represent a tip or service charge[.]” See G.L. c. 149, § 152A(d). The Appeals Court held that the phrase starting with the words “which informs the patron” modifies both “designation” and “written description.” Id. at 812–813. The last antecedent rule did not apply there because the antecedents were contained in a “single phrase (‘a designation or written description of that house or administrative fee’) consisting of two terms (‘designation or written description’) that are not separated by a comma.” Id. at 813. It explained that “[w]here several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all.” Id., quoting Porto Rico Ry., Light & Power Co. v. Mor, 253 U.S. 345, 348 (1920).
 
                                                            -11-
 
Here, in contrast, the two antecedents (“adds restrictions” and “amends any pre-existing restrictions”) are not contained in a single phrase; instead, each antecedent introduces much longer and independent phrases. Furthermore, as discussed above, the modifier in § 13.02(a)(5) is applicable only to the last antecedent (“amends any pre-existing restrictions”) and does not make sense if applied to the first antecedent (“adds restrictions"). Finally, although the two antecedents in § 13.02(a)(5) are not separated by a comma, like the statute considered in Bednark, “matters of punctuation are not necessarily determinative and should not be allowed to defeat the true purpose and meaning of a statute.” Lydon v. Contributory Retirement Appeal Bd., 101 Mass. App. Ct. 365, 370 (2022), quoting Globe Newspaper Co. v. Boston Retirement Bd., 388 Mass. 427, 432 (1983).
1.6.2. Applying the Statute. The 2019 amendments to the Companies’ articles of organization imposed a number of new restrictions on shareholders’ rights to sell or otherwise transfer their shares. Furthermore, these new restrictions, when considered as a whole, constitute “materially adverse” revisions to the prior restrictions. The amendments therefore trigger the Baldwins’ statutory right of appraisal and to compel the Companies to purchase their shares for fair value. See G.L. c. 156D, § 13.02(a)(5).
First, the amendments require each shareholder to give a right of first refusal to family members. Under the original articles, a shareholder could sell shares to whomever it wants if the corporation’s board did not exercise a right of first refusal on behalf of the corporation. But now, a shareholder that wants to sell off shares must first let members of their family group buy the shares from them, then let the corporation buy any remaining shares offered for sale, and only then consummate a sale to some other buyer. Furthermore, the shareholder is required to sell their shares proportionately to any family member, without regard to whether the shareholder does not want to sell or transfer their shares to any particular family members.
To the extent that the Companies argue that a new right of first refusal for family group members should not be considered a meaningful restriction on transfer rights, that argument is without merit. Provisions in articles of organization, bylaws, or a shareholder’s agreement that give the corporation or other shareholders a right of first refusal, when a stockholder decides to sell their shares, constitute “restrictions on transfers” that are “designed to prevent outsiders who are unacceptable to the other stockholders from acquiring an interest in the close corporation.” Donahue v. Rodd Electrotype Co. of New
 
                                                            -12-
 
England, Inc., 36 Mass. 578, 587 n.13 (1975); accord Albert E. Touchet, Inc. v. Touchet, 264 Mass. 499, 502 (1928) (such rights of first refusal are “restrictions … imposed upon the sale of shares”).
Second, the amendments restrict the price at which a shareholder may sell their stock to third-parties, if neither family members nor the corporation opt to purchase it. Under the original articles, if the corporation did not exercise its right of first refusal, then the shareholder was free to dispose of the stock “in any manner [they] may see fit,” even if the selling price was lower than what the shareholder had offered to the corporation. But now, if some or all of the stock that a shareholder offers for sale is not purchased by family members or the corporation, then the shareholder may not sell the stock to anyone else for a lower price, or on other terms that are less favorable to the shareholder, than the price and other terms that the shareholder offered to the family members and the corporation. If at the end of the new right-of-first-refusal process a shareholder finds that they can only sell their shares to a third-party by accepting less favorable terms, the shareholder would have to go through the right-of-first-refusal process all over again before consummating a sale on those new, less favorable terms. That is a new transfer restriction.
Third, the restated articles also require that any sale of stock to a third-party must be completed within 210 days after the shareholder first notified family members and the corporation that they wished to sell shares and triggered the right-of-first-refusal process. Under the original articles, there was no such time limit to sell to a third-party if the corporation did not purchase the shares.
Fourth, the amendments bar any sale of stock to any individual or entity that the board of directors deems to be a competitor of the corporation, or of any entity controlled by the corporation, without board approval. Under the original articles, the only way for the board to stop the sale of shares to competitor was to exercise the corporation’s right to purchase the shares. But now, the board can simply veto such a sale and force the shareholder to hold onto their shares.
The Companies argue that barring the sale of shares in a closely-held corporation without board approval is a reasonable and therefore enforceable restriction on a shareholder’s transfer rights. See generally Merriam v. Demoulas Super Markets, Inc., 464 Mass. 721, 728 (2013) (reasonable restrictions on stock transfers in articles of organization or bylaws are enforceable).
 
                                                            -13-
 
That is correct, but beside the point. A reasonable restriction on the transfer of shares is nonetheless a restriction, and therefore triggers appraisal rights under G.L. c. 156D, § 13.02(a)(5).
Fifth, the restated articles force a shareholder’s estate to accept less favorable price terms if a family member or the corporation exercises their right of first refusal. Under the original articles, the planned transfer of stock upon a shareholder’s death triggered the corporation’s right to purchase those shares, because the transfer resulted from the shareholder’s “desire” to transfer shares to an heir or other recipient. If the corporation opted to purchase the shares owned by a deceased shareholder, it had to pay the offer price or the value as determined by arbitrators in total within 30 days. But now, under the restated articles, if a shareholder dies and family members or the corporation opt to purchase their shares, the buyer can pay for those shares in equal monthly installments over a five year period. The imposition of a materially less favorable payment term is a restriction on shareholder’s transfer rights.
Sixth, the restated articles provide that any forced sale of a shareholder’s stock—for example by attachment or execution of a judgment, divorce decree, or other court order—is subject to family group members’ and the corporations’ rights of first refusal. Under the original articles, these kinds of forced, involuntary transfers were not subject to the corporation’s right of first refusal, because they did not result from any “desire” by the shareholder “to sell or transfer” their stock. But now they are subject to the Companies’ and family group members’ rights to buy the stock, and pay the purchase price in equal monthly installments over five years. Though these kinds of transfers by a shareholder are involuntary, restricting them constitutes a restriction on the transfer of shares within the meaning of G.L. c. 156D, § 13.02(a)(5).
As discussed in the prior section of this decision, restrictions on share transfer rights will trigger a right of appraisal even if they are not “materially adverse to the ability of the shareholder to transfer his shares.” But if the “materially adverse” standard applied here, which it does not, it would be satisfied. All of these new restrictions, considered together, are materially adverse to shareholders’ ability to sell or otherwise transfer shares in the Companies.
1.6.3. Remedy for the Companies’ Failure to Give Notice of Appraisal Rights. Since the restated articles of organization impose new restrictions on the transfer of shares, the Companies were required to give the shareholders advance that if the new articles were adopted then shareholders would be
 
                                                            -14-
 
entitled to assert appraisal rights. See G.L. c. 156D, § 13.20. If such notice had been provided, it would have triggered a statutory process starting before the vote and continuing after approval of new articles for shareholders to exercise their appraisal rights. See Id., §§ 13.21 to 13.30.
It is undisputed that the Companies never provided the required initial notice. As a result, the Companies are estopped from asserting that the Baldwins failed to deliver timely notice under G.L. c. 156D, § 31.21, of their intent to demand payment for their shares if the restated articles were adopted.
Furthermore, since the summary judgment record establishes that the Companies are closely-held corporations,[4] the failure of the directors and the majority shareholders to give the Baldwins notice of and allow them to exercise their rights of appraisal was a clear violation of the majority’s fiduciary duty to the minority shareholders. See generally Vale v. Valchuis, 471 Mass. 495, 505-06 (2015) (“a shareholder in a close corporation always owes a fiduciary duty to fellow shareholders.”) (quoting Merriam, 464 Mass. at 727); Donahue, 367 Mass. at 593 (“stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another”).
The Court must craft appropriate declaratory and injunctive relief to remedy the failure to give the Baldwins any chance to exercise their statutory appraisal rights after the May 2019 vote to adopted restated articles of organization.
“Courts have broad equitable powers to fashion remedies for breaches of fiduciary duty,” and similar breaches of statutory requirements, “in a close corporation.” Brodie v. Jordan, 447 Mass. 866, 871 (2006). “[E]quitable remedies are flexible tools to be applied with the focus on fairness and justice.” Smith v. Kelley, 484 Mass. 111, 127 (2020), quoting Demoulas v. Demoulas, 428 Mass. 555, 580–581 (1998). The statutory scheme established in the Massachusetts Business Corporation Act, G.L. c. 156D, “does not divest the courts of their equitable jurisdiction” or their power to provide shareholders in a closely-held corporation with an equitable remedy that differs in appropriate ways from
 
--------------------------------------------
 
[4]  A close corporation has a small number of shareholders, no ready market for  its capital stock, and “substantial majority stockholder participation in the management, direction and operations of the corporation.” Brodie v. Jordan, 447 Mass. 866, 868–869 (2006), quoting Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 586 (1975). It is undisputed that all of those criteria are met with respect to the Companies in this case.
 
                                                            -15-
 
their existing statutory and contractual rights. See Allison v. Eriksson, 479 Mass. 626, 637–639 (2018).
In the exercise of its equitable discretion, the Court concludes that the appropriate remedy is to require the Companies to give the Baldwins the opportunity to exercise their appraisal rights and to compel the Companies to purchase their shares for an amount equal to the higher of fair value as of May 2019 or fair value as of the date of repurchase. Under the statutory appraisal scheme, a corporation that has an obligation to repurchase shares is required to pay an amount equal to the fair value of the shares at the time of repurchase. See G.L. c. 156D, §§ 13.22(b)(2)(iii), 13.24(a), 13.26(a), and 13.30. The Court finds that, if the fair value of shares of stock in Polyvinyl or Indusol is much higher at the time of repurchase than in May 2019, it would be unfair to permit the Companies to repurchase shares for the fair value as of May 2019. Cf. Allison, 479 Mass. at 638 (a fair equitable remedy must “take into account the passage of time and changed circumstances”).
The Court will order the Companies to deliver to each of the Plaintiffs a written appraisal notice and form that comply with the requirements of G.L. c. 156D, § 13.22, including each corporation’s estimate of the fair value of the shares as of May 2019 and as of the date of the appraisal notice. Upon receipt of the notice and form, each of the Baldwins may choose to exercise appraisal rights pursuant to G.L. c. 156D, § 13.23.
For each plaintiff that chooses to exercise their appraisal rights, the Companies must: (1) make payment in cash within 30 days, consistent with the requirements of G.L. c. 156D, § 13.24, as modified in this decision, and (2) pay all reasonable attorneys’ fees and litigation expenses incurred by that plaintiff to obtain that payment, as provided in G.L. c. 156D, § 13.31(d). Any plaintiff that invokes their appraisal rights and is dissatisfied with the amount of payment may seek an appropriate remedy pursuant to G.L. c. 156D, § 13.26 and § 13.30, again modified by the Court’s determination that fair value of shares shall be determined as of May 2019 or as of the date of repurchase, whichever amount is higher.
2. The Baldwins’ Claims against the Connor Parties and Kourtis. The Baldwins have sued the Connors for breach of fiduciary duty, civil conspiracy,
 
                                                            -16-
 
and breach of contract.[5] They have also sued Kourtis for civil conspiracy and for aiding and abetting the Connors’ alleged breaches of fiduciary duty. The Connors and Kourtis have moved for summary judgment on all remaining claims against them.
2.1. Fiduciary Duty Claims against the Connors. The Baldwins base their claim for breach of fiduciary duty on a panoply of disparate allegations against Jack Connor (a/k/a John J. Connor, II) and his children Maria Connor and Tom Connor. Jack was a minority shareholder in both Companies until May 24, 2019, when he sold his shares to Maria and Tom. Jack was never a director of Indusol or Polyvinyl. Maria and Tom were directors of both Companies starting before 2019.
2.1.1. Offer to Purchase Polyvinyl’s Assets. In April 2019, a company called Magnitude offered to buy the assets of Polyvinyl Films in a structured transaction  for  payments  have  an  estimated  net  present  value   of  around $36 million. Maria and Tom decided that they were not interested in selling Polyvinyl’s business at that price. They never told the Baldwins about the offer.
The failure to share this information with the Baldwins was probably a breach of fiduciary duty. As Judge Ricciuti observed in deciding a prior motion to compel the production of documents, the Baldwins were entitled to this information as shareholders and (for a short time) as two of the directors of the Companies.
But the Baldwins have mustered no evidence that they suffered any compensable injury because Maria and Tom Connor did not tell them about this offer. Harm or injury is an element of a claim for breach of fiduciary duty. See, e.g., Eisenstein v. David G. Conlin, P.C., 444 Mass. 258, 267 (2005) (affirming
 
--------------------------------------------
 
[5] The Baldwins dismissed their claim under the Massachusetts Wage Act. The Baldwins assert two, duplicative claims alleging breach of fiduciary, calling the second one a claim for “minority shareholder oppression.” Under Massachusetts law, majority shareholders that oppress minority owners through a freeze-out are liable for breach of fiduciary duty. See, e.g., Brodie v. Jordon, 447 Mass. 866, 869 (2006). No Massachusetts appellate decision has recognized a separate cause of action for “minority shareholder oppression.” The Court notes that Delaware has expressly declined to do so. See Lidya Holdings Inc. v. Eksin, 2022 WL 274679, *4 (Del. Ch. Jan. 31, 2022) (“there is no standalone remedy for stockholder oppression in Delaware”).
 
                                                            -17-
 
grant of summary judgment dismissing breach of fiduciary claim by law firm against former partners for failure to present evidence of damages).
Without the support of Maria and Tom, the sale could not take place because far less than two-thirds of the shares in Polyvinyl would be voted in support of the transaction. Cf. G.L. c. 156D, § 13.01(e). Since nothing would have changed if the Baldwins had been told of this offer, as they should have been, the Baldwin suffered no harm because the information was withheld.
It follows that Maria and Tom are entitled to summary judgment in their favor on this part of the claim against them for breach of fiduciary duty. See generally Roman v. Trustees of Tufts College, 461 Mass. 707, 711 (2012) (“A nonmoving party’s failure to establish an essential element of her claim ‘renders all other facts immaterial’ and mandates summary judgment in favor of the moving party.” (quoting Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991)); Schwartz v. Travelers Indem. Co., 50 Mass. App. Ct. 672, 682 (2001) (affirming summary judgment for defendant on contract claim because plaintiff could not muster any evidence he suffered damage as a result).
2.1.2. Adoption of 2019 Restated Articles of Organization. The Baldwins contend that the Connors violated their fiduciary duties in several ways by participating in the Companies’ adoption of restated articles of organization in May 2019. The summary judgment record shows that the Baldwins cannot prove any of these parts of their fiduciary duty claims.
2.1.2.1. Unanimous Shareholder Approval of Waiver Was Never Required. The 2019 restatements could not have constituted a breach of fiduciary duty on the theory that they improperly eliminated a requirement that all directors and all shareholders must approve any waiver of the Companies’ right of first refusal when a shareholder decides to transfer their stock, because there was no such requirement.
As noted above, the restated articles of organization adopted by the Companies’ boards and shareholders in May 2019 expressly exempted transfers of shares to family members from any rights of first refusal. The restated articles define restrictions that generally apply to stock transfers, but do not apply to “Permitted Transfers.” That term is defined to include any transfer (by a lineal descendant of a company founder) to a family member (as defined), to trusts that only benefit family members, or to entities as to which family members own all voting, capital, and profit interests.
 
                                                            -18-
 
The Baldwins contend that the new exemption for permitted transfers to family members was designed to get around a requirement purportedly imposed in 2000 that all shareholders (including the Baldwins) must agree to any waiver of the Companies’ right of first refusal when a shareholder wishes to transfer their stock, and that Jack Connor breached his fiduciary duty to the Baldwins by participating in a scheme to eliminate their ability to veto such a waiver.
This claim fails, as discussed above in § 1.4 of this decision, because: (I) there is no evidence that the Companies’ boards of directors and shareholders actually voted in 2000 to require unanimous shareholder and director approval to waive the Companies’ rights of first refusal when a shareholder wished to transfer their shares, and (ii) if such votes were taken, they were ineffective as amendments to the articles of organization because they were never filed with the Secretary of the Commonwealth, and not effective as bylaw amendments or shareholder agreements because they were inconsistent with the articles.
Since there was no legally enforceable requirement that all shareholders unanimously approve any waiver of the Companies’ rights of first refusal, the Baldwins cannot prove that Jack Connor breached a fiduciary duty by helping to eliminate that non-existent requirement.
2.1.2.2. Prior Notice of 2019 Votes. The Baldwins’ claim that they were not given sufficient notice of the proposed 2019 amendments fails as a matter of law. The Companies’ bylaws, as then in effect, required that notice of a shareholders’ meeting had to be delivered or mailed to each shareholder at least ten days in advance. The bylaws stated in relevant part that:
[Written notice] shall be delivered not less than ten nor more than fifty days before the date of the meeting … to each shareholder of record entitled to vote at such meeting by leaving such notice with him or at his residence or usual place of business, or by mailing it, postage prepaid, and addressed to such stockholder at his address as it appears upon the books of the corporation.
The summary judgment record establishes that Jim Baldwin received notice of the shareholder meetings ten days of advance, and that notice was mailed to the other Baldwins ten days in advance.
The bylaws make clear that notice was timely and effective upon mailing. The provision allowing notice to be provided “by mailing it” is broad enough to encompass private mail delivery services such as Federal Express, DHL, or the
 
                                                            -19-
 
United Parcel Service (known as UPS).[6] By statute, written notice by mail is effective upon mailing. See G.L. 156D, § 1.42(c).
2.1.2.3. Refusal to Delay the 2019 Votes. For much the same reasons, the Connors’ purported unwillingness to delay the May 13, 2019, shareholders’ meetings cannot have constituted a breach of fiduciary duty.
The bylaws constituted contracts between the Companies and their shareholders. See Jessie v. Boynton, 372 Mass. 293, 303 (1977) (bylaws). As discussed in the prior section, the bylaws provided that shareholders’ meetings could be held on ten days’ notice. Since the bylaws did not require more than ten days’ notice, it cannot constitute a breach of fiduciary to decline to delay a properly noticed meeting merely because some shareholders want extra time.
Under Massachusetts law, “[a] claim for breach of fiduciary duty may arise only where the agreement does not entirely govern the shareholder’s actions.” Merriam, 464 Mass. at 727; accord Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 537–538 (2014). In other words, when a contested action “falls entirely within the scope of a contract,” as in this case, any obligations derive from the contract and defendant’s conduct “is not subject to question under fiduciary duty principles.” Selmark, supra, quoting Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007).
2.1.2.4. Jack’s Signing of Proxies. Jack Connor did nothing improper in connection with the May 13, 2019, shareholder votes by signing proxies for his adult children with respect to shares of stock that they owned or controlled. The summary judgment record establishes that, when Jack gave that stock to his children, they in turn gave Jack authority to act on their behalf with respect to their ownership interests, including voting for them, signing their names, and acting as their proxy. All four of Jack’s children signed notarized confirmations of agency attesting to those facts. And, since Jack had lawful authority to sign proxies for his children, the Companies properly gave the proxies effect as the act of the shareholders. See G.L. c. 156D, § 7.24(a) & (e).
2.1.2.5. Self-Interest of Maria and Tom. The Baldwins complain that Maria and Tom had an interest in being able to buy Jack’s ownership interests without having to vote as board members to waive the Companies’ rights of first
 
--------------------------------------------
 
[6] See, e.g., E&H Conveyors, Inc. v. New Horizons Equity Funding, LLC, 2019 WL 13098890, *1 (E.D. Pa. Oct. 17, 2019); Alfa Denizcilik A.S. v. Aston-Agro Industrial A.G., 2006 WL 8460368, * 1 (S.D.N.Y. Oct. 17, 2006); Intelligender, LLC v. Soriano, 2012 WL 215066, * 2 (E.D. Tex. Jan. 24, 2012);
 
                                                            -20-
refusal. But the mere fact that Maria and Tom had an interest in Jack being able to transfer his membership interests to them does not, standing alone, support a claim against them for breach of fiduciary duty. So long as the owners or managers of a closely-held corporation or LLC are “acting within a proper course of corporate conduct,” they are entitled to exercise “their right to ‘selfish ownership’ ” and make decisions from which they will benefit. O’Brien v. Pearson, 449 Mass. 377, 390 (2007), quoting Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 850-851 (1976).
Things would be different if the 2019 amendments had the effect of depriving the Baldwins of any part of their ownership interests. A vote by corporate directors to force unwilling shareholders to give up their ownership interests in the company, such as through a freeze-out merger, would constitute a breach of fiduciary duty unless the directors can show that the transaction advanced a legitimate corporate purpose, did not harm the corporation, and was fair to the minority owners who lost their ownership shares. See Coggins v. New England Patriots Football Club, Inc., 397 Mass. 525, 534 (1986).
But nothing like that happened here. The 2019 vote did not deprive the Baldwins of their ownership interests, or take any other rights away from them. Though the amended articles of organization exempted transfers of ownership interests to family members from the Companies’ rights of first refusal, that merely made it unnecessary for Jack Connor to obtain waivers of those rights from the boards (both controlled by the Connor family) before selling his shares to Maria and Tom. The Baldwins lost nothing as a result. Coggins and similar cases are not relevant.
2.1.3. Purchase and Sale of Jack Connor’s Ownership Interests.
2.1.3.1. Jack Connor’s Intent to Sell His Shares. The Baldwins contend that Jack Connor had a contractual obligation under the Companies original articles of organization to give the Companies notice in early May 2019 that he had a desire to sell or transfer his shares, so that the Companies could choose to exercise their right of first refusal, and that Jack’s failure to do so was a breach of fiduciary duty.
This part of the fiduciary duty claim against Jack Connor fails as a matter of law because its predicate is incorrect. The Court concludes that this provision in the original articles, which constitute a contract between the Companies and
 
                                                            -21-
 
their shareholders,[7] is unambiguous and that its meaning is therefore a question of law that the Court may decide on a summary judgment motion.[8]
The Baldwins misread the original right-of-first-refusal provision. The original articles did not impose an affirmative duty upon any shareholder to inform the Companies whenever they formed a subjective desire to sell or otherwise transfer their shares. Instead, the right of first refusal provision merely barred the sale or transfer or shares without first giving the corporation’s board notice and an opportunity to purchase the shares on behalf of the corporation.
Nor did Jack have any independent fiduciary duty at common law to reveal to the Baldwins that he was interested in selling his shares to his children. See generally Adelman v. Adelman, 60 Mass. App. Ct. 753, 767–768 (2004) (shareholder in closely-held corporation does not owe other shareholders fiduciary in connection with personal purchase or sale of corporate stock).
The Baldwins also assert that Jack Connor breached his fiduciary duty by closing on the sale of his shares in May 2019 when there was purportedly a question whether the Companies’ restated articles of organization had been validly adopted, and without disclosing the issue to the Baldwins. This contention also fails as a matter of law. The May 2019 votes to adopt the restated articles were all valid, as discussed above in § 1.5 of this decision. Jack could not have violated any fiduciary duty by proceeding on the basis that the votes were valid, because they were valid as a matter of law.
2.1.3.2. Maria’s and Tom’s Intent in Buying Jack’s Shares. The Baldwins contend that a judge or jury could find at trial that Maria and Tom wanted to buy Jack’s shares so that they could, thereafter, carry out their alleged plan to squeeze out the Baldwins.[9] Evidence of such an intent may be relevant at trial
 
--------------------------------------------
 
[7] See Chokel v. Genzyme Corp., 449 Mass. 272, 275 (2007).
[8] See Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002). “Whether a contract is ambiguous is also a question of law.” Eigerman v. Putnam Investments, Inc.,  450 Mass. 281, 287 (2007). Though the contract documents may be hard to parse does not make them ambiguous. See Sullivan v. Southland Life Ins. Co., 67 Mass. App. Ct. 439, 443 (2006). And the fact that the parties disagree about how to read the contracts does not make them ambiguous either. See Indus Partners, LLC v. Intelligroup, Inc., 77 Mass. App. Ct. 793, 795 (2010) (affirming summary judgment).
[9] There is no right to a jury trial on a claim that a shareholder or director of a closely-held corporation  breached their  fiduciary  duty  to minority  owners.
<continued…>
 
                                                            -22-
 
in determining whether there was in fact an unlawful freeze-out. But such an intent, standing alone, would not constitute a breach of fiduciary duty if no freeze-out ever occurred. Similarly, the Baldwins cite no authority to support their argument that Jack violated his fiduciary duty by failing to alert the Baldwins that Maria and Tom allegedly wanted to buy his shares to make it easier for them to freeze out the Baldwins.
2.1.4. Failure to Give Notice of Appraisal Rights. Maria and Tom Connor are not entitled to summary judgment in their favor with respect to their failure to provide the Baldwins with notice of their statutory appraisal rights in connection with the 2019 amendments to the Companies’ articles of organization. As discussed above in §§ 1.6.1 to 1.6.3 of this decision, the restated articles of organization impose new restrictions on the transfer of shares, and therefore the Companies were required to give the shareholders notice before the new articles were adopted that they would be entitled to assert appraisal rights. See G.L. c. 156D, § 13.20.
The failure of the Companies’ directors and majority shareholders to provide the Baldwins with the required notice, and to allow them to exercise their appraisal rights, constituted a violation of Maria’s and Tom’s fiduciary duties.
The remedy that the Court outlined in § 1.6.3, if carried out, could moot this part of the claim for breach of fiduciary duty by ensuring that the Baldwins are made whole. In the meantime, however, the Baldwins have a viable claim that they suffered compensable injury by the failure of Maria and Tom to trigger and honor the Baldwins’ statutory rights of appraisal.
2.1.5. Jack Connor Owed no Fiduciary Duty after Selling his Shares. Many of the Baldwins’ allegations regarding purported breaches of fiduciary duty concern things that happened after May 24, 2019, when Jack Connor sold his shares in the Companies to Maria and Tom Connor. Once Jack Connor was no
 
--------------------------------------------
 
See Merola v. Exergen Corp., 423 Mass. 461, 464  (1996) (majority  shareholder’s claim for breach fiduciary duty of loyalty to shareholders of close corporation was equitable claim properly decided by judge rather than jury). A claim for breach of loyalty or some other fiduciary duty “falls within a branch of equity jurisdiction well known at the time of the adoption of our Constitution in 1780,” and therefore no party may “claim trial by jury as a matter of right” on such a claim. City of Boston v. Dolan, 298 Mass. 346, 355 (1937); accord Commissioner of Banks v. Harrigan, 291 Mass. 353, 356 (1935). “There is no constitutional right to a jury trial when the  cause  of  action  arises  in  equity.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 526 (1997).
 
                                                            -23-
 
longer a part-owner of the Companies, he owed no fiduciary duty to any of the Baldwins. Jack is entitled to summary judgment in his favor on all parts of the claims for breach of fiduciary duty that are based on acts or omissions that allegedly occurred after May 24, 2019.
2.1.6. Alleged Freeze-Out. The summary judgment record would support a finding at trial that Maria and Tom breached fiduciary duties by freezing out the Baldwins. Whether Maria and Tom actually did breach fiduciary duties (after they bought Jack Connor’s shares) by firing Jack Baldwin and allegedly pressuring Jim, Robert, and John E. Baldwin to resign by making their lives miserable and their positions with the Companies untenable, cannot be resolved on summary judgment.
“Freeze-outs can occur … ‘[w]hen the reasonable expectations of a [minority] shareholder are frustrated.’ “ Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 536 (2014), quoting Pointer v. Castellani, 455 Mass. 537, 550 (2009); see also Clemmer v. Cullinane, 62 Mass. App. Ct. 904, 905–906 (2004) (rescript) (minority owner of closely-held corporation may sue for breach of fiduciary duty based on allegation that corporate fiduciary kept corporate benefits for themselves while denying them to minority owner) (applying Delaware law).
Terminating or constructively terminating the employment of a minority shareholder may constitute a breach of fiduciary duty, whether they have a contractual right to continued employment or not. See Selmark Associates, Inc. v. Ehrlich, 467 Mass. 525, 536 (2014); Merola v. Exergen Corp., 423 Mass. 461, 464 (1996); Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 849–850 (1976).
Summary judgment is not appropriate as to whether Maria and Tom breached fiduciary duties by forcing the Baldwins out of their positions as officers of the Companies because it is not an issue that may be resolved as a matter of law. See generally Berry v. Commerce Ins. Co., 488 Mass. 633, 636 (2021) (“Summary judgment is appropriate where there is no material issue of fact in dispute, and the moving party is entitled to judgment as a matter of law.”); Dennis v. Kaskel, 79 Mass. App. Ct. 736, 741 (2011) (summary judgment may not be granted where “a reasonable jury could return a verdict for the nonmoving party” (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).
Though Maria and Tom contend that the business judgment rule provides a complete defense to the claim that they froze out the Baldwins, that cannot be resolved as a matter of law on summary judgment either.
 
                                                            -24-
 
2.2. Civil Conspiracy and Aiding and Abetting Claims. The claims that Maria Connor, Tom Connor, and Nicholas Kourtis conspired with each other to accomplish breaches of fiduciary duty, and the similar claim that Kourtis aided and abetting breaches of fiduciary duty by Maria and Tom, cannot be resolved on summary judgment.
Maria, Tom, and Kourtis mainly argue that these claims cannot survive because there is no evidence of any underlying breach of fiduciary duty. As discussed in § 2.1.4 and § 2.1.6 above, however, there is sufficient evidence to support several parts of the breach of fiduciary duty claims against Maria and Tom. And, based on the summary judgment record, a reasonable factfinder could find that Kourtis conspired with and aided and abetted Maria and Tom in not letting the Baldwins exercise their appraisal rights and in allegedly freezing the Baldwins out of their jobs with and management roles in the Companies.
In contrast, Jack Connor is entitled to summary judgment in his favor on the civil conspiracy claim against him. There is no record evidence suggesting that he participated in any way in decisions not to inform the Baldwins of their appraisal rights, or that he had anything to do with the freeze-out that allegedly took place after Jack had sold his shares to Maria and Tom.
2.3. Breach of Contract Claim. The Baldwins say that their claim for breach of contract has two bases. Both fail as a matter of law.
First, as discussed in § 2.1.3.1 above, Jack Connor did not have a contractual obligation to notify the Companies that he was thinking about selling his stock. The Companies’ right of first refusal under the original articles of organization required only that shareholders inform the Companies before they actually sold the shares, so that the boards of directors could decide whether to exercise the Companies’ right to buy the shares. The summary judgment record establishes that Jack did not sell his shares until after the articles were amended to exempt sales to family members from the Companies’ rights of first refusal.
Second, as discussed in § 1.5.1 and § 1.5.2 above, the May 13, 2019, board and shareholder votes to adopt restated articles of organization and bylaws were valid. Since the original articles and bylaws were no longer in effect when Jack Connor sold (and Maria and Tom bought) his shares, the Connors could not have violated them by selling and buying Jack’s shares.
3. Baldwins’ Motion for Leave to Assert Claims against Stephen Kane. The Baldwins seek leave to amend their complaint to add Attorney Stephen M.
 
                                                            -25-
 
Kane as a defendant on their claims for civil conspiracy and for aiding and abetting alleged breaches of fiduciary duty by Maria and Tom Connor. The Court will deny this motion on the ground that the proposed amendment would be futile. See, e.g., Nguyen v. Massachusetts Inst. of Tech., 479 Mass. 436, 461 (2018) (affirming denial of motion to amend complaint to assert new claims because undisputed facts made clear that amendment would fail as a matter of law and thus be futile).
3.1. Futility—Legal Standards. “Courts are not required to grant motions to amend prior complaints where ‘the proposed amendment ... is futile.’ ” Johnston v. Box, 453 Mass. 569, 583 (2009), quoting All Seasons Servs., Inc. v. Commissioner of Health & Hosps. of Boston, 416 Mass. 269, 272 (1993)).
A proposed amendment would be futile if the new claims could not a survive motion to dismiss. Mancuso v. Kinchla, 60 Mass. App. Ct. 558, 572 (2004) (affirming denial of motion to amend).
To survive a motion to dismiss under Mass. R. Civ. P. 12(b)(6), and thus to avoid being futile under Rule 15, a complaint must allege facts that, if true, would “plausibly suggest[] … an entitlement to relief.” Lopez v. Commonwealth, 463 Mass. 696, 701 (2012), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).
“Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.”  Doe  v.  American  Guar.  & Liab.  Co., 91 Mass. App. Ct. 99, 105 (2017), quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). “While ‘detailed factual allegations’ are not required at the pleading stage, mere ‘labels and conclusions’ will not survive a motion to dismiss.” Burbank Apartments Tenant Ass’n v. Kargman, 474 Mass. 107, 116 (2016), quoting
Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).
A proposed amendment would also be futile if it could not survive a pending motion for summary judgment as to existing claims. “Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant.” Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007).[10] Although Cockrell and
 
--------------------------------------------
 
[10] Accord, e.g., Executive Leasing Corp. v. Banco Popular de Puerto Rico, 48 F.3d 66, 71 (1st Cir. 1995); Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001); Steinburg v. Chesterfield County Planning Comm’n, 527 F.3d 377, 390-391 (4th Cir. 2008); King v. East St. Louis School Dist. 189, 496 F.3d 812, 819-820 (7th Cir. 2007); Watson v. Beckel, 242 F.3d 1237, 1239-1240 (10th Cir 2001).
 
                                                            -26-
 
the cases cited in the preceding footnote were all decided under the federal rules of civil procedure, the same principle applies here. See generally Smaland Beach Ass’n, Inc. v. Genova, 461 Mass. 214, 228 (2012) (judicial construction of federal rules of civil procedure applies to parallel Massachusetts rules, “absent compelling reasons to the contrary or significant differences in content” (quoting Strom v. American Honda Motor Co., 423 Mass. 330, 335 (1996), and Rollins Envtl. Servs., Inc., v. Superior Court, 368 Mass. 174, 180 (1975)).
If an existing summary judgment record establishes that that there are no material facts in dispute, and that defendants would be entitled to summary judgment in their favor on a proposed new claim as a matter of law, then the proposed amendment would be futile and the motion for leave to file such an amended complaint should therefore be denied. See, e.g., Milanese v. Rust- Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001).
3.2. Futility—Analysis. The proposed amendment to add claims against Attorney Kane would be futile.
Many of the proposed changes would merely add conclusory assertions that Kane conspired with the Connors and Kourtis, or that he aided and abetted alleged breaches of fiduciary duty, without any accompanying allegations as to what Kane supposedly did. (See, e.g., proposed amended complaint ¶¶ 59, 62, 70, 87, 120, 126, 130, 131, 139, 149, 152, 153.) Such unexplained, conclusory assertions do not, standing alone, state a claim that would survive a Rule 12(b)(6) motion to dismiss. See, e.g., Burbank Apartments Tenant Ass’n, 474 Mass. at 116; American Guar. & Liab. Co., 91 Mass. App. Ct. at 105.
The proposed allegations that the Companies’ articles of organization and bylaws were amended in 2000 to require unanimous approval by all shareholders and directors before the Companies could waive their right of first refusal to repurchase shares, and that Kane conspired with and aided and abetted the Connors in maneuvering to eliminate that requirement in 2019, would be futile. As discussed in § 1.4 above, there is no evidence that the articles and bylaws were amended to add this requirement in 2000, any such amendment of the articles would have been ineffective because it was not filed with the Secretary of the Commonwealth, and any such amendment of the bylaws or any such shareholder agreement would have been ineffective because it would have conflicted with the then-existing articles. This part of the proposed claims against Attorney Kane would be futile because, as discussed above, it could not survive summary judgment.
 
                                                            -27-
 
The proposed allegation that Kane advised the Connors (through Kourtis) not to flag that Maria and Tom were “interested” directors would be futile. As discussed in § 1.5.2 above, as a matter of law Maria and Tom were entitled to vote on the restated articles and bylaws in May 2019. And as discussed in § 2.1.2.5 above, Maria and Tom’s participation the May 2019 votes did not constitute a breach of fiduciary duty.
The proposed allegations that Kane advised the Connors not to disclose that the board votes on May 13, 2019, were ineffective is based in a false premise. As discussed in § 1.5.1 and § 1.5.2 above, these votes to adopt restated articles and bylaws were entirely proper and valid. This proposed claim would also be futile because it could not survive summary judgment.
The proposed allegations that Kane advised the Connors not to tell the Baldwins about an offer in early 2019 to purchase Polyvinyl’s assets would be futile because, as discussed in § 2.1.1 above, there is no evidence that the Baldwins suffered any compensable injury as a result. This proposed claim would therefore be futile because it could not survive summary judgment.
Finally, the proposed allegations that Kane and the Connors had a plan to make Kane counsel for the Companies would be futile because the proposed factual allegations do not plausibly suggest that it would be or was a breach of fiduciary duty for the Connors to hire Kane to serve as company counsel.
4. Counterclaims against the Baldwins. The Baldwins seek summary judgment in their favor on all remaining counterclaims asserted against them by Maria and Tom Connor.[11]
The remaining counterclaims against the Baldwins fail for lack of subject matter jurisdiction because they may only be asserted as a derivative action on behalf of the Companies, which means the Connors lack standing to assert them as direct claims. In any case, with the exception of the small portion of the fiduciary duty claim based on allegations that Jim and John Baldwin improperly charged personal expenses to corporate credit cards, the other components of these counterclaims would fail even if they had been asserted derivatively rather than as a direct claim by individual shareholders.
 
--------------------------------------------
 
[11] The Connors’ counterclaim for abuse of process, and Kourtis’s counterclaim against John E. Baldwin, were dismissed by stipulations in June 2023. Jack Connor dismissed his other counterclaims with prejudice in January 2024.
 
                                                            -28-
 
4.1. Lack of Standing. Maria and Tom Connor lack standing to press their claims that the Baldwins interfered with a possible sale of Polyvinyl, mismanaged the Companies before May 2019, or harmed the Companies by resigning from their positions as officers and directors in May 2019. They also lack standing to press their claims that Jack Baldwin engaged in self-dealing by accepting an annual salary, and that Jim and John Baldwin used the Companies’ credit card to pay for personal expenses.
They lack standing to assert these claims on their own behalf because any injury from this alleged interference and mismanagement, from the Baldwins’ resignations, or from the allegedly improper self-dealing was caused to the Companies; there is no evidence that Maria or Tom was directly harmed by any of this alleged misconduct.
“As a general rule, a shareholder does not have standing to sue to redress an injury to the corporation in which he holds an interest.” Quarterman v. City of Springfield, 91 Mass. App. Ct. 254, 262, review denied, 477 Mass. 1107 (2017), cert. denied sub nom. City of Springfield, Mass. v. Quarterman, 138 S. Ct. 506 (2017); see also Bessette v. Bessette, 385 Mass. 806 (1982) (affirming dismissal of brought by majority stockholder of close corporation on own behalf that should have been brought as derivative action on behalf of corporation).
Standing is a question of subject matter jurisdiction. Indeck Maine Energy, LLC v. Commissioner of Energy Resources, 454 Mass. 511, 516 (2009). The question of whether a plaintiff has standing, like all questions of subject matter jurisdiction, “goes to the power of the court to hear and decide the matter.” Ginther v. Commissioner of Ins., 427 Mass. 319, 322 n.6 (1998). Subject matter jurisdiction cannot be conferred by consent, conduct or waiver.” Rental Prop. Mgmt. Svcs. v. Hatcher, 479 Mass. 542, 547 (2018), quoting Litton Business Sys., Inc. v. Commissioner of Revenue, 383 Mass. 619, 622 (1981).
“Because standing is a question of subject matter jurisdiction, it must be established irrespective of whether it is challenged by an opposing party.” HSBC Bank U.S.A., N.A. v. Matt, 464 Mass. 193, 199 (2013) (citation to Indeck omitted). “Courts … have both the power and the obligation to resolve questions of subject matter jurisdiction whenever they become apparent, regardless whether the issue is raised by the parties.” Id., quoting Nature Church v. Assessors of Belchertown, 384 Mass. 811, 812 (1981).
“To determine whether a claim belongs to the corporation, and is therefore derivative, ‘a court must inquire whether the shareholders' injury is distinct
                                                                        -29-
 
from the injury suffered generally by the shareholders as owners of corporate stock.’ ” International Bhd. of Elec. Workers Local No. 129 Benefit Fund v. Tucci, 476 Mass. 553, 557–558 (2017), quoting Stegall v. Ladner, 394 F.Supp.2d 358, 364 (D. Mass. 2005) (Woodlock, J.) (applying Massachusetts law). Where a corporate shareholder seeks to remedy an alleged harm to the corporate entity caused by the defendant’s purported breach of a duty owed to that entity, the claim or claims must be brought derivatively on behalf of the corporation or LLC. Tucci, supra.
Here, Maria and Tom have mustered no evidence that they suffered any injury themselves, that is distinct from alleged harm to the Companies, because of the Baldwins’ alleged breaches of fiduciary duty.
The claims that the Baldwins mismanaged the Companies, and then further harmed them by refusing to continue to participate in management, may only be asserted as a derivative action on behalf of the Companies. See Jackson v. Stuhlfire, 28 Mass. App. Ct. 924, 925 (1990) (alleged mismanagement adversely affected plaintiffs only as owners of corporate stock, and thus could only be challenged in derivative action). The same is true of the claim that the Baldwins harmed the Companies by interfering with possible sales of the corporations. Cf. Tucci, 476 Mass. at 554, 562 (claim that board of directors proposed merger transaction for inadequate price could only be brought derivatively).
That is because a claim that some unlawful act caused the value of a corporation to be diminished or reduced—and as a result diminished or reduced the value of each shareholder’s interest in the corporation—is a claim “belonging to the corporation,” not to the individual shareholders, under Massachusetts law. Pagounis v. Pendleton, 52 Mass. App. Ct. 270, 275 (2001) (shareholder “lacked standing personally” to assert counterclaim that corporation’s landlord unreasonably withheld consent to lease assignment, thereby forcing corporation into bankruptcy and destroying value of its stock; claim could only be asserted either directly by the corporation or as a derivative suit on behalf of the corporation); accord Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988) (claim charging corporate mismanagement that depressed value of stock alleges wrong to corporation, that is to stockholders collectively, and thus may only be enforced by derivative action)
This principle applies with full force to claims that a shareholder or director of a close corporation breached his fiduciary duty and thereby diminished or reduced the value of the company’s stock. See Tucci, 476 Mass. at 554, 562.
 
                                                            -30-
 
The claims that Jack Baldwin should have to repay part of his salary, or that Jim and John Baldwin should have to repay the Companies for certain credit card charges, must similarly be dismissed because they may only be brought as derivative claims. “It is a basic principle of corporate law” that if a shareholder receives “a salary in excess of the reasonable value of services rendered, the right to recover the overpayments belongs to the corporation” and thus may only be brought as a derivative action. Bessette, 385 Mass. at 809– 810 (affirming dismissal of direct action). The same is true of any other claim that shareholders dissipated corporate assets by obtaining improper payments from the company. See Mendelsohn v. Leather Mfg. Corp., 326 Mass. 226, 237 (1950) (alleged misappropriation of corporation’s funds could only be challenged through derivative action).
4.2. Futility of Repleading as a Derivative Claim. Maria and Tom Connor may not seek to recast their existing counterclaims as derivative actions at this time because they have not demonstrated compliance with the statutory requirement that a written demand be made on the corporations to take action on their own behalf. In 2004 the Legislature imposed “a universal demand requirement on shareholder derivative suits” on behalf of Massachusetts business corporations by enacting G.L. c. 156D, § 7.42. See Halebian v. Berv, 457 Mass. 620, 625 (2010).
But, with the minor exception of the allegations about credit card charges by Jim and John Baldwin, it would be futile for Maria and Tom to take the steps necessary to seek leave to amend their answer to assert the remaining counterclaims as derivative actions.
4.2.1. Tortious Interference Counterclaim. To the extent that the Connors contend that the Baldwins interfered in potential sales of the Companies before June 13, 2016, that aspect of the counterclaim for tortious interference is time- barred. This claim is subject to a three-year statute of limitations. See G.L. c. 260, § 2A. The summary judgment record makes clear that the Connors knew in 2012 that the Baldwins were taking steps that (allegedly) interfered with a potential sale to Inteplast Group, and knew in 2014 that the Baldwins took other steps that (allegedly) interfered with a potential sale to Allegiance Capital Corporation. Though the Connors spend substantial effort lining up evidence of this purported interference well over three years before this action was filed, that part of their tortious interference claim is barred by the statute of limitations.
 
                                                            -31-
 
If this counterclaim were brought derivatively, the only part that would not be time-barred would be the allegation that the Baldwins scuttled a potential sale to Artemis Capital Associates in 2017 and 2018 by making financial demands that Artemis was not willing to meet, and by not cooperating with the Connors’ efforts to consummate a sale on terms the Baldwins were not willing to accept.
“The tort of intentional interference with advantageous relations protects a plaintiff's present and future economic interests from wrongful interference.” Blackstone v. Cashman, 448 Mass. 255, 259 (2007). To prove this claim, Maria and Tom Connor would have to show that (I) the Companies had an advantageous relationship with Artemis, (ii) the Baldwins each “knowingly induced” Artemis to break off its relationship with the Companies, (iii) the interference, “in  addition to  being  intentional,  was  improper  in  motive  or  means,” and (iv) the Companies suffered harm as a result. Id. at 260.
The Baldwins would be entitled to summary judgment on this counterclaim if it were asserted derivatively because Maria and Tom have mustered no evidence that the alleged interference was improper in motive or in means.
The evidence suggests that the Baldwins were looking out for their own economic interests when they declined to acquiesce in a sale to Artemis. But “advancing one’s own economic interest, by itself, is not an improper motive” for the purpose of a tortious interference claim. See Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App. Ct. 611, 621 (2014); accord, e.g., United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990); Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 608 & 609 (2007); Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass. App. Ct. 34, 39 (2004). Maria and Tom have no evidence of any other, improper motive.
Though the Connors contend that the Baldwins acted with “actual malice,” the summary judgment record makes clear they do not have the evidence to prove that part of their claim. The alleged motivation of personal financial gain, standing alone, does not rise to the level of “actual malice” as a matter of law. King v. Driscoll, 418 Mass. 576, 587 (1994) (evidence that employee was terminated so that company could buy back his stock and defendant employees could benefit financially held insufficient to establish actual malice and improper interference); see also United Truck Leasing, 406 Mass. at 817 (desire to obtain personal financial gain is not “improper motive” for purpose of proving intentional interference claim).
 
                                                            -32-
 
4.2.2. Fiduciary Duty Counterclaim. The counterclaim that the Baldwins breached their fiduciary duties has several parts. The summary judgment record establishes that almost all of them would fail if asserted as a derivative action on behalf of the Companies.
4.2.2.1. Company Management Before June 13, 2016. To the extent that the Connors contend that the Baldwins mismanaged  the  Companies  before  June 13, 2016, by failing to follow the Connors’ advice regarding business strategy and operations, that aspect of the counterclaim for breach of fiduciary duty is time-barred. See G.L. c. 260, § 2A.
A claim for breach of fiduciary duty accrues, meaning that the statutory limitations period starts to run, when the plaintiff has actual knowledge of the wrong allegedly committed by the fiduciary. Hays v. Ellrich, 471 Mass. 592, 602 (2015).
The summary judgment record makes clear that the Connors knew about the management decisions that Maria and Tom now claim constituted breaches of fiduciary duty, such as the reliance upon one customer for the vast majority of Polyvinyl’s sales, at the time they were made. As a result, claims concerning these management decisions that occurred more than three years before this action was filed are barred by the statute of limitations.
4.2.2.2. Company Management from June 2016 to May 2019. The claim that the Baldwins breached their fiduciary duty in the three years leading up to their resignation from management positions fails for two, independent reasons.
First, this claim is barred by acquiescence. the Connors were well aware at the time of the business strategy decisions that they now criticize, the Connor family members (as majority shareholders and holding a majority of the boards of directors) could have vetoed or overridden any business decision with which they disagreed, and they never did so. Maria and Tom were shareholders and officers, and Maria was also a director, of both Companies throughout this period. The summary judgment record establishes that they were very familiar with the Baldwins’ management and operation of the Companies, and did nothing before May 2019 to try to change it.
Having acquiesced in the Baldwins management decisions, Maria and Tom Connor cannot now claim that those decisions constituted a breach of fiduciary duty. Uccello v. Gold'n Foods, Inc., 325 Mass. 319, 327–329 (1950); see also Micro Networks Corp. v. HIG Hightec, Inc., 195 F.Supp.2d 255, 266–267 (D.Mass. 2001)
 
                                                            -33-
(Gorton, J.) (granting summary judgment on ground that stockholder acquiesced in corporate actions). “A stockholder who, with knowledge of the facts, himself has given his consent to, or acquiesced in, acts of the directors or other corporate officers, or of majority shareholders, cannot ordinarily attack such acts afterwards.” Pavlidis v. New England Patriots Football Club, Inc., 675 F.Supp. 696, 698 (D.Mass. 1987) (Skinner, J.), quoting 12B W. Fletcher, Cyclopedia of the Law of Private Corporations, § 4862 (rev. perm. ed. 1984).
The Connors have effectively conceded this point by failing to respond at all to the Baldwins’ well supported and well developed argument that the Connors acquiesced in the Baldwins’ management and operation of the Companies.
A party that opposes a motion in the Superior Court must submit a written memorandum “that includes a statement of reasons, with supporting authorities, that the motion should not be allowed.” Sup. Ct. Rule 9A(a)(2). This ensures that the opposing party provides sufficient notice of and support for its arguments and that the moving party has the opportunity to respond in writing in a short reply memorandum. Parties waive issues and arguments that they do not raise and develop in their written memoranda. See Board of Reg. in Med. v. Doe, 457 Mass. 738, 743 n.12 (2010) (argument raised for first time at oral argument, in violation of rule requiring that parties’ contentions must be presented in written brief, is waived).
Second, this part of the counterclaims would also be barred by the business judgment rule if asserted derivatively.
This rule protects corporate directors and officers “from liability for conduct that they have taken in good faith, with the care that a person in a like position would reasonably believe appropriate in similar circumstances,” and that the person “reasonably believes to be in the best interests of the corporation.” Halebian, 457 Mass. at 627 n. 11 (applying business judgment rule to derivative action on behalf of corporation under G.L. c. 156D, § 7.44). “[T]he statutory business judgment rule is set forth, as to directors, in G.L. c. 156D, § 8.30, and, as to officers, in G.L. c. 156D, § 8.42.” Id.
If the business judgment rule applies, a corporate decision maker cannot be held “responsible for mere errors of judgment or want of prudence short of ‘clear and gross negligence.’ ” Uccello, 325 Mass. at 321, quoting Spiegel v. Beacon Participations, Inc. 297 Mass. 398, 410–412 (1937). The burden is on the party challenging a corporate management decision to establish that it was grossly negligent. Uccello, supra.
 
                                                            -34-
 
The Connors contend that the Baldwins were grossly negligent, but not with respect to the management decisions that allegedly constituted a breach of fiduciary duty. Instead, they argue that Jack Baldwin’s office was messy, the Polyvinyl office area and the Indusol boardroom were dirty, the Companies’ information technology infrastructure was old, there was black mold in a Polyvinyl conference room, and Polyvinyl employees had no lunchroom.
None of this has anything to do with the alleged mismanagement that the Connors claim constituted a breach of fiduciary duty. The Connors fault the Baldwins for failing to diversify Polyvinyl’s customer base, causing the Companies to rely on temporary workers and overtime, and failing to ensure timely shipment of products to all customers.[12] The Baldwins cannot be held liable for these exercises of business judgment absent evidence that these decisions were grossly negligent. See Uccello, 325 Mass. at 321; Finnegan v. Baker, Suffolk Supr. Ct. no. SUCV2009-03772BLS1, 2012 WL 6629636, at *26 (Mass. Supr. Ct. Oct. 19, 2012) (Lauriat, J.) (“To show a director [or officer] acted with gross negligence, ‘the plaintiff must prove the director [or officer] did not adequately apprise himself of the information material to the decision in question.’ ”) (quoting Kahn v. Roberts, 1995 WL 745056, at *4 (Del. Ch. Dec. 6, 1995).
Allegations of negligence that have nothing to do with the actions that allegedly constitute a breach of fiduciary duty are irrelevant in applying the business judgment rule. Cf. G.L. c. 156D, § 8.30(c) and § 8.42(c) (no liability for any action or failure to act undertaken in good faith, with reasonable care, and in a manner reasonably believed to be in best interests of corporation).
4.2.2.3. The Baldwins’ Resignations. Maria and Tom Connor also contend that the Baldwins committed a breach of fiduciary duty by orchestrating their resignations as officers, employees, and directors of the Companies. This part of their counterclaims would also fail if reasserted as a derivative action. None of the Baldwins had any obligation to continue in any management or employment role with the Companies. And the Connors have mustered no evidence whatsoever that the Companies suffered any kind of compensable injury because the Baldwins decided to leave those roles at the same time.
 
--------------------------------------------
 
[12] The Connors also argue that the Baldwins breached their fiduciary duty by failing to anticipate that the price of plastic resin would more than double due to the COVID-19 pandemic. The business judgment rule bars that part of the fiduciary duty claim.
 
                                                            -35-
 
4.2.2.4. Jack Baldwin’s Salary. Maria and Tom could not assert a derivative claim challenging Jack Baldwin’s salary because they acquiesced in those payments for years. See Uccello, 325 Mass. at 327–329.
4.2.3. Civil Conspiracy Counterclaim. Finally, if the counterclaim for civil conspiracy were reasserted as a derivative claim on behalf of the Companies it could not survive summary judgment either.
To state a claim for civil conspiracy on a “concerted action” theory, a plaintiff must allege facts plausibly suggesting “an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement.” Bartle v. Berry, 80 Mass. App. Ct. 372, 383–384 (2011). In other words, this kind of conspiracy claim “is ‘akin to a theory of common law joint liability in tort.’ ” Greene v. Philip Morris USA Inc., 491 Mass. 866, 871 (2023), quoting Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994).
With respect to the allegations that Jim and John Baldwin improperly charged personal expenses to the Companies, Maria and Tom Connor have mustered no evidence that anyone else was complicit in Jim’s or John’s alleged wrongdoing. This part of the conspiracy claim would fail because there is no evidence that, with respect to these credit card charges, there was “a common plan to commit a tortious act” and that anyone else knowingly provided “substantial assistance” to Jim or John in allegedly causing the Companies to pay some of their personal expenses. Cf. Kurker v. Hill, 44 Mass. App. Ct. 184, 188-189 (1998)
For the reasons discussed above, none of the other counterclaims for tortious interference or breach of fiduciary duty could survive summary judgment if repleaded as derivative actions. In the absence of any “underlying tortious act,” Maria and Tom Connor could not prove their counterclaim for civil conspiracy. See Bartle, supra.
ORDERS
The Court orders as follows with respect to the five pending motions for summary judgment and the pending motion to amend the complaint.
(1) Plaintiffs’ motion for partial summary judgment as to their claim for declaratory judgment in  count V of  their  third  amended complaint (doc. no. 183) is denied in part, and the motion for summary judgment by Polyvinyl Films, Inc. and Indusol, Inc. (the “Companies”) as to count V (doc no. 165) is allowed in part, with respect to the validity of the May 2019 to the Companies’
 
                                                            -36-
 
articles of organization. Plaintiffs’ summary judgment motion as to count V is allowed in part, and the Companies’ motion for summary judgment is denied in part, with respect to the Plaintiff’s claimed statutory right of appraisal.
When final judgment enters in this case, it shall include declarations and orders that:
o The votes by the boards of directors and shareholders of Polyvinyl Films, Inc., and Indusol, Inc. (the “Companies”) in May 2019 to adopt restated articles of organization and bylaws were valid, and therefore the restated articles and bylaws were validly adopted.
o The Companies’ restated articles of organization imposed new restrictions on the transfer of outstanding shares of stock, and therefore triggered the shareholders’ appraisal  rights  under  G.L. c. 156D, § 13.02(a)(5).
o The Companies breached their statutory duty under G.L. c. 156D,
§ 13.20, to provide notice of appraisal rights before adopting the restated articles of organization. The Companies are therefore estopped from asserting that the Plaintiffs failed to deliver timely notice, under G.L. c. 156D, § 31.21, of their intent to demand payment for their shares if the restated articles were adopted.
o To remedy the Companies’ failure to provide timely notice of the shareholders’ appraisal rights, the Companies shall, within 15 days after the entry of judgment in this case, deliver to each of the Plaintiffs a written appraisal notice and form that complies with the requirements of G.L. c. 156D, § 13.22, except that § 13.22(b)(2)(iii) is modified to require each corporation to provide an estimate of the fair value of the shares as of May 2019 and as of the date of the notice. Upon receipt of this notice and form, each of the Plaintiffs may choose to exercise appraisal rights pursuant to G.L. c. 156D, § 13.23.
o For each Plaintiff that chooses to exercise their appraisal rights, the Companies must: (1) make payment in cash within 30 days, consistent with the requirements of G.L. c. 156D, § 13.24, except that the payment must equal the higher of the repurchased shares’ fair value as of May 2019 or their fair value as of the date of repurchase; and (2) pay all reasonable attorneys’ fees and litigation expenses
 
                                                            -37-
 
incurred by the Plaintiff to obtain that payment, as provided in G.L. c. 156D, § 13.31(d).
o Any plaintiff that invokes their appraisal rights and is dissatisfied with the amount of payment may seek an appropriate remedy pursuant to G.L. c. 156D, § 13.26 and § 13.30, except the reference to “fair value” in those statutes shall for this purpose be determined as of May 2019 or as of the date of repurchase, whichever amount is higher.
o The parties shall confer in good faith and attempt to reach agreement as to the amount of reasonable attorneys’ fees and litigation expenses that any Plaintiff who exercises their appraisal rights is entitled to recover under G.L. c. 156D, § 13.31(d). If the parties fail to reach such an agreement, then any Plaintiff that is entitled to recover fees and expenses under § 13.31(d) shall, within 30 days after the Companies have repurchased their ownership shares, file a petition and all supporting papers seeking an award of fees and expenses.
(2) The Connor Defendants’ motion for summary judgment (doc. no. 176) is allowed in part with respect to all claims (in counts I, II, IV, and VII) against John J. Connor, II. It is (I) denied in part with respect to the claims against Maria H. Connor and Thomas P. Connor (in counts I and IV) for breach of fiduciary duty based on Maria’s and Tom’s failure to notify Plaintiffs of their statutory right of appraisal in connection with the May 2019 adoption of restated articles of  organization,  and  based  on  their  alleged  freeze-out  of  the  Plaintiffs, (ii) allowed in part with respect to all other parts of the claims against Maria and Thomas Connor for breach of fiduciary duty (in counts I and IV) and for breach of contract (in count VII), and (iii) denied in part with respect to the claims against Maria and Thomas Connor for civil conspiracy (in count II).
(3) Defendant Nicholas Kourtis’ motion for summary judgment (doc. no. 171), as to the claims against him for civil conspiracy (count II) and aiding and abetting breach of fiduciary duty (count III) is denied.
(4) Plaintiffs’ motion for leave to amend their complaint to add Attorney Stephen M. Kane, Esq., as a defendant (doc. no. 199) is denied.
(5) Plaintiffs’ motion for summary judgment as to the remaining counterclaims against them by Maria and Thomas Connor (doc. no. 191) is allowed.
 
                                                            -38-
 
(6) The parties shall report in writing by April 26, 2024, whether they will agree to retain and work with a neutral mediator to explore whether, in light of the Court’s rulings, they can now reach a settlement of their dispute.
(7) The Court will conduct a trial assignment conference, to discuss and schedule trial of the remaining claims, on May 8, 2024, at 2:00 p.m., in person. The parties shall confer about and be prepared to discuss how long it will take to try to remaining claims. They shall also determine witness availability and be prepared to set a trial date.